## OSCAR MAYER FOODS CORPORATION, Plaintiff,

v.

## CONAGRA, INC. and Swift–Eckrich, Inc., Defendants.

No. 92–C–718–S.

United States District Court, W.D. Wisconsin.

Feb. 24, 1994.

---

Allen A. Arntsen, Foley & Lardnes, Madison, WI, for plaintiff.

Robert Horowitz, Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

Plaintiff Oscar Mayer Foods Corporation commenced this action alleging that defendants Conagra, Inc. and Swift–Eckrich, Inc. infringed its U.S. Patents Number 4,789,729 and 5,017,391 relating to the processing of fish and poultry. Defendants dispute the infringement allegations and assert that the patents are invalid for obviousness. The issues of infringement and validity were tried to a jury for four days from September 20 to September 23, 1993. At the conclusion of trial the jury returned a verdict finding the patents valid and infringed. The issue of damages was tried to the jury on September 29 and 30, 1993. At the conclusion of the damage phase of trial the jury returned a verdict finding the infringement was willful and determining damages to be $9,835,000.

Prior to the entry of judgment defendants moved the Court to enter judgment in their favor as a matter of law pursuant to Rules 50 and 58. The Court denied the defendants' motions and entered judgment in plaintiff's favor in the amount determined by the jury.

The matter now comes before the Court on various motions after verdict advanced by both parties. Defendants seek reconsideration of the previous denial of the motion to enter judgment in their favor under Rule 58. Defendants also renew their motions for judgment as a matter of law pursuant to Rule 50(b) on the issues of validity, infringement and damages. Alternatively, defendants seek a new trial pursuant to Rule 59. Plaintiff moves to amend the judgment pursuant to Rule 59(e) to include damages for additional infringing sales, enhanced damages under 35 U.S.C. § 284, attorney's fees and interest.

## DEFENDANT'S MOTIONS

Because defendants' motions challenge the liability determination it is appropriate to address them first. Initially, the Court must address the appropriate scope of its review for each of the motions they pursue.

Defendants first suggest the Court can make *de novo* findings of fact relevant to obviousness pursuant to Rule 49(a) and enter judgment pursuant to Rule 58 based upon those findings. More specifically, defendants assert that the form of the special verdict was inadequate to obtain answers to all relevant fact issues, and because the plaintiff acquiesced in the verdict form and the instructions, the Court is authorized to act as factfinder pursuant to Rule 49(a). Because the special verdict which the jury answered was appropriate under the circumstances of this case and encompassed all factual issues, there is no basis for the Court to make *de novo* findings of fact and, accordingly, no basis for the motion under Rule 58.

Verdict forms in patent cases may be made more or less specific in the discretion of the Court based upon the nature of the case. *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 720 (Fed.Cir. 1984). In this case the special verdict questions isolated the issues of validity, infringement, willfulness and damages. The Court rejected defendants' expansive form of special verdict requesting many questions which sought to determine irrelevant facts and asked questions which were duplicative, confusing and likely to lead to an inconsistent verdict. Both the parties and the Court sought to submit the underlying validity fact issues to the jury through the verdict and instructions.

The form of special verdict submitted to the jury was consistent with the nature and complexity of the issues presented. The sole validity defense pursued by defendants at trial was obviousness. There was little factual dispute concerning the scope and content of prior art or the level of ordinary skill in the art. Accordingly, the principal factual issues were the extent of the differences between prior art and the inventions, and those secondary considerations impacting on obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). The legal issues relevant to validity which were not resolved by motion in limine were also sufficiently limited so they could readily be explained to the jury in the instructions.

Under these circumstances the Federal Circuit explains the effect of the jury's verdict:

> Having made these decisions, the trial court must then determine what factual issues remain in the case and, by its instructions, should direct the jury's attention to disputed factual issues which, when resolved, lead *inexorably*, in the opinion of the district court, to a determination of obviousness or nonobviousness.

*Structural Rubber Products*, 749 F.2d at 722 (emphasis added). The court has not abdicated its responsibility to determine legal issues involving obviousness, but has made those determinations by its rulings on pretrial motions and its instructions. When this procedure is followed a jury's verdict necessarily leads to the entry of judgment under Rule 58 in favor of the party prevailing on the verdict.

■ Defendants' belated objection to the form of the validity question does not entitle it to ignore the jury's resolution of fact issues. This Court does not read footnote 3 to *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1561–62 (Fed.Cir.1993), as implicitly eliminating the long recognized authority of the trial court to chose the most appropriate method for presenting factual issues to the jury. Indeed, *Structural Rubber Products*, relied upon as the authority for the statement in footnote 3 to *Mendenhall*, expressly recognizes and affirms that discretionary authority. 749 F.2d at 720.

■ The authority to find facts rests with the jury, and the Court may not substitute its view of the facts for those of the jury. *Senmed, Inc. v. Richard–Allen Medical Industries, Inc.*, 888 F.2d 815, 818 (Fed.Cir. 1989); *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed.Cir.1988). It would be error to make factual findings under Rule 49 where the validity question posed to the jury implicitly included all factual issues necessary to its resolution.

> Turning to the action taken by the court here, we do not agree that the court was free to make a specific finding under rule 49(a) which *overruled* an implicit finding of the jury within the broader question. Rather, the court had to accept the jury's

determination and could set it aside only if were not supported by substantial evidence.

*Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1453 (Fed.Cir.1984) (citations omitted). Accordingly, *de novo* factual review is inappropriate and reconsideration of the denial of defendants' Rule 58 motion is denied. Defendants must proceed under the standards of Rules 50 and 59.

■ Under Rule 50 the Court accepts the implicit factual findings of the jury which support the verdict unless those findings are not supported by substantial evidence.

> [W]hile "a specific verdict" seeks resolution of only *factual* issues under a precise reading of rule 49(a), this court has not found legal error where a legal question has been included. Rather, since the answer to the legal question necessarily resolves any underlying factual issues, we have undertaken to review the factual findings on which the legal issue is based, applying the substantial evidence standard.

*Quaker City Gear Works*, 747 F.2d at 1453. "Substantial" evidence is such relevant evidence taken from the record as a whole as might be accepted by a reasonable mind as adequate to support the finding under review. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984).

■ While the Court must give deference to the jury's findings of fact in ruling under Rule 50, it decides issues of law, including the legal issue of obviousness, *de novo*. This is true regardless of whether the special verdict sought the answer to the ultimate legal issue from the jury. *Senmed*, 888 F.2d at 818. *Newell*, 864 F.2d at 764.

■ A motion for new trial pursuant to Rule 59 may be granted where the verdict is against the weight of the evidence, damages are excessive, or the trial was not fair to the moving party for some other reason. *Forrester v. White*, 846 F.2d 29, 31 (7th Cir. 1988). In considering whether the trial was fair the Court may also consider questions of law arising from substantial errors in the admission or rejection of evidence or the giving or refusing to give instructions. 11

Charles A. Wright & Arthur C. Miller, *Federal Practice and Procedure,* § 2805 (1973).

Applying these standards the Court considers each of the issues advanced by the defendants.

*Obviousness*

Consideration of the law of obviousness begins with a review of *Graham,* 383 U.S. 1, 86 S.Ct. 684, which outlines the fundamental considerations involved in the determination of obviousness.

> Under section 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long-felt but unsolved needs, failure of others, etc., might be utilized to give life to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Id.* at 17–18, 86 S.Ct. at 694.

 Plaintiff benefits from a presumption of nonobviousness codified at 35 U.S.C. § 282 which imposes a constant burden upon the defendant to prove nonobviousness by clear and convincing evidence. *Structural Rubber Products,* 749 F.2d at 714. In addition,

> Deference is due the Patent and Trademark Office decision to issue the patent with respect to evidence bearing on validity which it considered, but no such deference is due with respect to evidence it did not consider. All evidence bearing on the validity issue, whether considered by the PTO or not, is to be taken into account by the tribunal in which validity is attacked.

In addition to these fundamental tenets of obviousness, defendants focus the Court's attention upon the role of purpose or motive in the determination of obviousness. Defendants correctly note that it is a general rule that merely discovering and claiming a new benefit of an old process cannot render the process patentable. *In re Woodruff,* 919

F.2d 1575, 1578 (Fed.Cir.1990). But this is not to say that motivation is irrelevant to the issue of obviousness where the claimed composition differs from prior art. Under such circumstances the prior art must provide the motivation to make the claimed composition in the expectation that it would have similar properties to that possessed by the prior art. *In re Dillon,* 919 F.2d 688, 693 (Fed.Cir. 1990). Where a composition possesses properties unexpected by the prior art or to an unexpectedly greater degree, they may be patentable.

At the outset the Court rejects defendants' assertion that this case is controlled as a matter of law by *In re Baxter Travenol Labs,* 952 F.2d 388 (Fed.Cir.1991) or *In re Woodruff,* 919 F.2d 1575. Both cases involved the appellate review of the denial of a patent application by the Patent and Trademark Office and, accordingly, placed the burden of proof not upon the patent challenger, but upon the patent owner to establish validity. More importantly, both cases involved the attempt to patent a combination or process which was identical or nearly identical to prior art. *Baxter* expressly involved the issue of anticipation, not obviousness. 952 F.2d at 390. Defendants have not pursued anticipation in this case, it being apparent that the process and product in plaintiff's patents are not anticipated by prior art. *Woodruff,* while not discussed as an anticipation case, involves a process nearly identical to an old process in the prior art. In fact, the Court notes:

> The atmospheres recited in claims 27 and 31 are anticipated by the atmosphere taught in *McGill* patent except for the overlapping or adjacent ranges of carbon monoxide concentration.

919 F.2d at 1577. Thus *Woodruff,* like *Baxter,* truly involved an old process which was disclosed in the prior art.

 In contrast, there is no evidence in the prior art of the application of sodium lactate to precooked, nonsterilized anaerobically packaged poultry or fish. Hence, *Baxter* and *Woodruff* do not mandate judgment in defendants' favor as a matter of law. Rather, the obviousness of plaintiff's patents must be judged by whether the prior art

would have provided motivation to perform the claimed process to one skilled in the art. More specifically, whether the prior art made it obvious to one of ordinary skill in the art to add sodium lactate to precooked, anaerobically packaged poultry or fish.

The Court finds that there was substantial evidence at trial to support the finding that the prior art did not teach that sodium lactate would be useful under the circumstances of plaintiff's patent claims. The evidence suggested three possible motivations to use sodium lactate in the plaintiff's patented process: (1) for the control of clostridium botulinum, (2) as a flavorant, and (3) as a shelf life extender. The evidence at trial was very strong that the property of retarding the growth of clostridium botulinum was unknown in the prior art. Similarly, there is little suggestion in the prior art that sodium lactate is a desirable flavorant in poultry or fish. In fact, the evidence at trial suggested the opposite, that its flavor was not compatible with poultry and that it was too expensive to be reasonably used as a salt substitute.

Defendants' principal argument is that prior art taught the use of sodium lactate as a means to extend shelf life. Defendants rely upon four items of prior art: the Ueno patent (defendants' exhibit 1133), the Fukui patent (defendants' exhibit 1131), the Angersbach article (defendants' exhibit 1150) and the Purac petition (plaintiff's exhibit 201). Viewing this prior art as a whole the Court cannot find that it rendered plaintiff's patented process obvious or that there was not substantial evidence to support the jury's finding of nonobviousness.

The Purac petition at page 5 sets forth the principal prior art knowledge concerning the preservative effects of sodium lactate:

> Based on its humectant qualities, sodium lactate is used to lower the water activity of meat products and to increase their shelf life.

Of course this prior art knowledge was well known to the patent examiner who granted plaintiff's patents notwithstanding its express acknowledgment that the use of salts, including sodium lactate, to lower water activity was well known in the prior art. Indeed, the thrust of plaintiff's argument, ultimately accepted by the patent examiner, was that its process did not rely upon the lowering of water activity in the poultry or fish processed in its patent. Furthermore, there was testimony at trial that, given the level of moisture in precooked anaerobically packaged poultry, sodium lactate would not be added for the purpose of lowering water activity.

The Angersbach article does little to expand upon the knowledge and use of salts as a preservative. Although the article speaks generally in terms of meat, it is clear that the teachings of Angersbach are directed towards the use of salt to lower water activity as a preservative in red meat. In fact, Angersbach concludes that sodium lactate, as well as other sodium salts, must be used in approximately the same amounts as sodium chloride to suppress the growth of the bacteria tested. Furthermore, the specific products to which his article refers include raw sausage, scalded sausage, cooking sausage, ham and pickle solution, all products previously preserved through the addition of salts as described in the Purac petition.

The Fukui patent offers nothing that would teach the use of sodium lactate in anaerobically packaged precooked poultry or fish. In fact, Fukui is directed to the control of aerobic bacteria in bakery products such as sponge cakes, doughnuts and waffles. Fukai mentions fish paste principally to note that the invention described imparts a more satisfactory touch improving the toughness of fish paste, hardly making it obvious to inject sodium lactate into the products encompassed by plaintiff's patents.

Of principal importance to the defendants' argument is the Ueno patent which "relates to an aquious sterilizing agent for foods or food processing machines and utensils and to a method for sterilizing foods for food processing machines and utensils by using the aquious sterilizing agent." While Ueno does mention chicken as one possible fresh foodstuff which could be dipped in the aquious solution, it also mentions a host of other foods focusing upon vegetables. Ueno addresses the problem of sterilizing uncooked foods under aerobic conditions. Sodium lactate is not discussed prominently, but is men-

tioned only as one possible substance to be used in combination with the primary alcohol solution. Ueno certainly does not compel a finding of obviousness as to the plaintiff's claimed invention. A person skilled in the art would need to overcome the hurdles that Ueno addresses only fresh, uncooked foodstuffs and aerobic bacteria. Furthermore, given the huge number of combinations of foodstuffs and substances discussed, inferring or learning from Ueno that the injection of sodium lactate in cooked anaerobically packaged poultry would be likely to extend shelf life or control clostridium botulinum would be extremely difficult.

In conclusion, there was ample evidence to support the determination that plaintiff's invention would not have been obvious to one ordinarily skilled in the art. Although it was known that sodium lactate had certain preservative properties, the extent to which sodium lactate controlled the growth of bacteria including clostridium botulinum was unexpected based upon the prior art. Accordingly, the prior art would not have motivated one of ordinary skill in the art to perform the steps in plaintiff's invention.

■ Although defendants are not entitled to judgment as a matter of law, the Court must also consider whether the trial was unfair to them. They contend that the trial was unfair because the jury instructions, by failing to expressly address the issue of purpose, likely caused the jury to improperly consider only whether it was obvious that clostridium botulinum would be prevented and not whether it was obvious to perform the steps of the patent for other purposes.

A careful examination of the jury instructions does not support defendants' claim of unfairness. Furthermore, any confusion in that regard encountered by the jury was the result of the defendants' own jury instruction submissions or lack of submission, and cannot be the basis for a new trial.

The jury was instructed generally as follows:

As stated earlier, only the patent claims can be infringed. The specification, which is the written description already discussed, cannot be infringed. Each of the claims must be considered individually, and not all claims of a patent must be infringed before the patent is infringed.

The jury was further instructed:

The claims are the measure of the alleged invention of the patents and cannot be construed to include more than their language fairly imparts. Claims are to be construed as they would be by those skilled in the art. The claims must be construed the same way for purposes of the infringement determination as for the validity determination.

The jury was also instructed on the effect of the preamble of the claim, the only portion of plaintiff's claim which references clostridium botulinum, as follows:

The general rule is that the preamble of a claim does not limit the claim.

At defendants' request, and based upon their submission, the Court added the following language:

If it appears that the preamble is necessary to properly define the subject matter that the inventors actually invented and intended to be covered by the claim, then the preamble may properly be considered as a limitation to the claim.

Based upon these instructions it is likely that the jury excluded consideration of the preamble, including the statement that the invention was for the purpose of delaying the growth of clostridium botulinum and simply considered whether it would have been obvious to perform the method steps of plaintiff's '729 patent. Moreover, even had the jury considered the purpose of delaying the growth of clostridium botulinum to be a limitation to the claim, it would have done so only based upon the instruction supplied by defendants and supported by defendants' citation to *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 678 (Fed.Cir.1988). Since any prejudice which befell the defendants was the result of their own proposed instruction, it cannot be the basis for a new trial.

Furthermore, defendants did not submit a requested instruction more specifically addressing the issue of purpose at any time during the trial notwithstanding daily opportunities at each morning's pre-trial confer-

ence to submit such an instruction. It is apparent to the Court that such failure to submit a purpose instruction was the result of a strategic decision on defendants' part. Defendants advanced substantial testimony at trial to the effect that presently licensed users of plaintiff's invention were using it not for the purpose of delaying the growth of clostridium botulinum, but for the purpose of extending the shelf life of their products. Defendants' agents testified that they were not using plaintiff's invention to delay clostridium botulinum, but were doing so to extend shelf life. Accordingly, defendants sought to argue, based upon their requested preamble instruction, that they were not infringing plaintiff's patent because the purpose for which they were using the invention was not to delay clostridium botulinum. A contrary instruction on the role of purpose or motivation would have undercut this argument.

In fact, plaintiff proposed such an instruction in its original submission on infringement which provided as follows:

> If what Conagra is doing is covered by any of the claims of the patents in suit, Conagra is infringing regardless of its motive or purpose.

Had this statement remained in the instruction it would have been unequivocally clear to the jury that motive or purpose was irrelevant to the issues of infringement and invalidity since they were expressly instructed that their interpretation of the claims must be identical for both purposes. Based upon defendants' objection the instruction was not given.

At the jury instruction conference on the final day of the liability trial defendants' attorney made the following comment:

> Finally, missing from the instructions is any instruction about the significance of the purpose of the invention and the *Lemelson* case makes it important, makes clear that that's an important aspect of the case and it's absent from both the instructions and jury verdict. It was not commented upon or allowed to be commented upon by our jury—our patent law expert yesterday, and I think the jury will need some guidance on that issue.

In response to this comment the Court incorporated additional language on motive or purpose into the infringement instruction. When defendants objected to the Court's proposed additional instruction on the lack of importance of motive or purpose, suggesting for the first time additional language to be added to the obviousness instruction, the Court deleted its proposed addition, returning the instructions to their previous form. Accordingly, the Court finds that if the jury was misled as to the role of motive or purpose in the scope of the patent claims, that confusion was the result of defendants' repeated objections to inserting an instruction which would have cured any misunderstanding and in its failure to timely submit its own requested instruction on that subject.

In conclusion, the Court finds that trial was not unfair so as to entitle defendants to a new trial and that the verdict was consistent with, not contrary to, the weight of the evidence.

*Infringement*

Plaintiff's motion for judgment as a matter of law on the issue of infringement is a restatement of its prior motion in limine seeking an interpretation of its patent which would preclude infringement for products which contained sodium chloride. In general, defendants seek judgment in their favor on the grounds that all of their products contain salt (sodium chloride) and the presence of salt precludes them from infringing plaintiff's patents. The Court issued a written order on September 14, 1993 rejecting defendants' proposed patent interpretation as contrary to the language of the patent claims and patent specification history. That decision is hereby incorporated herein by reference.

Defendants' motion for new trial on the issue of infringement stems from evidentiary rulings and instructions which were consistent with the written decision on their motion in limine. Accordingly, since the Court reaffirms its decision on the motion in limine, it also finds that rulings consistent therewith cannot be the basis for a new trial.

*Damages*

Defendants advance three arguments in favor of their motions for judgment as a matter of law and new trial which concern the damages phase of the trial. First, defendants assert that plaintiff failed to produce evidence sufficient to identify the infringing products which supports damages for lost profits or reasonable royalties. Second, defendants assert that lost profits are unavailable because they could have produced a noninfringing substitute during the period of infringement. Third, defendants assert that as a matter of law damages must be limited to royalty amounts because of the nature of the contractual licensing arrangement between plaintiff and Purac. The Court rejects each of these arguments as a basis for judgment as a matter of law in defendants' favor or a new trial.

■ Defendants' position that there was insufficient evidence to support a finding of infringement by its products is contrary to any realistic view of the record in this case. The products for which plaintiff sought damages were contained in its trial exhibit 1, which is a compilation of documents produced by the defendants identifying defendants' poultry products which contained sodium lactate in the amounts covered by plaintiff's patent. Defendants admitted in their written responses to plaintiff's first set of interrogatories that these products were cooked under high humidity conditions as described in plaintiff's patent, were cooled after cooking, and were packaged in a plastic barrier package. Plaintiff's expert, Dr. Deibel, testified that in his opinion all of the products in plaintiff's exhibit 1 met all the elements of the relevant claims of plaintiff's patents. Defendants did not challenge this testimony, nor did they present any contrary evidence suggesting that any of the products on plaintiff's exhibit 1 did not meet the elements of the claims in plaintiff's patents.

Defendants' expert, Professor Silliker, testified only about how common it was to employ most of the procedures identified as elements of plaintiff's claims. The great weight of the evidence supported the conclusion that the products identified on plaintiff's exhibit 1 infringed plaintiff's patents. The inference is inescapable in light of the failure of defendants to come forth with any evidence that any of its products did not infringe.

Defendants also challenge the evidence on the grounds that Dr. Deibel should have been excluded based upon his lack of expertise. The Court affirms its ruling that Dr. Deibel's background and experience are sufficient to qualify him to put forth an opinion concerning whether the steps of the patent were performed in the production of defendants' products identified on exhibit 1. There is little question that plaintiff's expert, Dr. Stewart, relied upon the items on exhibit 1 for the calculation of damages. Accordingly, the Court finds that the evidence was ample to support the jury's determination that the products on exhibit 1 were infringing and that the damages were calculated based upon the sales of those infringing products.

■ Defendants' second challenge to the damage verdict concerns the need to demonstrate absence of acceptable noninfringing substitutes as an element of a claim for lost profits. Defendants assert they demonstrated the availability of a noninfringing substitute entitling them to judgment as a matter of law and, alternatively, that the jury was not properly instructed on that requirement. Because the Court finds that the jury was properly instructed on the law and the evidence supported a finding by reasonable probability of the amount of lost profits determined by the jury, the verdict must be affirmed.

The Court in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir.1978), set forth the following formula for the computation of lost profits in a patent infringement case:

> To obtain as damages the profits on sales he would have made absent the infringement, *i.e.*, the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

There is no dispute in this case concerning elements 1, 3 and 4.

The second element of the *Panduit* test has been modified under certain circumstances to recognize that a plaintiff may recover lost profits even though it admits the presence of acceptable noninfringing substitutes by proving instead its probable market share of the infringing sales. This alternative approach was recently discussed in *BIC Leisure Products, Inc. v. Windsurfing International, Inc.*, 1 F.3d 1214, 1219 (Fed.Cir. 1993);

> This court has held that a patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes. This market share approach allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove with reasonable probability sales it would have made "but for" the infringement.

(Citations omitted.)

The instructions provided to the jury were entirely consistent with the law on proof of lost profits through the market share approach. In relevant part the jury was instructed as follows:

> A factual basis for the lost profits caused by infringement may exist if you find that "but for" the infringement the patent owner would have made the sales that the infringer made. In proving his damages the patent owner's burden of proof is not an absolute one, but rather a burden of reasonable probability.
>
> ·* * * * * *
>
> In determining lost profits plaintiff must prove by a preponderance of the evidence: ... (2) the percentage of the market share of infringing sales which would have been realized by plaintiff; ... in calculating lost profits, if any, you should consider the amount or number of lost sales, the gross receipts that plaintiff would have obtained from the lost sales had there been no infringement, cost of sales to be deducted from the gross receipts, and, then, the profit on the lost sales.

If you find that plaintiff has not proved that it would have made its market shares worth of defendant's sales, then for those sales you must award an amount based on a reasonable royalty which I will explain to you in a moment.

For purposes of pursuing lost profits plaintiff conceded the existence of noninfringing substitutes and provided evidence and proof of what it believed its market share of defendants' infringing sales would have been. There was conflicting evidence at trial concerning that percentage of defendants' sales which would have been retained by it had it produced a product without the use of sodium lactate. It was defendants' position that it would have maintained its entire market share through the use of nonlactate containing products. It was plaintiff's position that the nonlactate product would have been entirely unsalable since all competitors had by 1989 converted to a lactate containing product. The jury reasonably rejected both positions and came to a conclusion in the middle, rejecting plaintiff's expert's assessment of lost profits at over $18 million and determining instead lost profits to be $9.25 million. This result was consistent with the conflicting evidence. The evidence at trial indicating the desire of retailers for longer shelf life clearly supported by a reasonable probability the finding of the jury that defendants would not have maintained their full market share without the incorporation of sodium lactate into their products.

■ Defendants' final attack on the damage verdict is that plaintiff's damages should be limited to the royalties it would have received under the Purac agreement assuming that defendants had chosen to obtain a license from Purac. In essence, defendants position is that once plaintiff decided to exclusively license its patent under a contract that provided for sublicenses, it precluded itself from recovering any damages for lost profits from infringers who chose not to accept the sublicense offered by plaintiff's licensee. Defendants cite no authority in support of this proposition. To the contrary, the fact that a patent holder has offered a license to the infringer or others does not preclude the patent holder from suing for lost profits.

*Beatrice Foods Co. v. New England Printing & Lithographing Co.,* 899 F.2d 1171, 1173 (Fed.Cir.1990). If defendants' position were upheld a tremendous disincentive would be created for any patent holder to liberally license its invention in a manner similar to that employed by the plaintiff. Defendants, having failed to take advantage of plaintiff's licensee's offer, cannot rely upon that license to limit its damages.

## PLAINTIFF'S MOTIONS

Plaintiff's post-verdict motions seek enhancement of the judgment entered in its favor pursuant to 35 U.S.C. §§ 284 and 285. Specifically, plaintiff seeks treble damages, pre- and post-judgment interest, and attorney's fees. Plaintiff also requests additional damages for infringement which occurred after judgment as a result of the delayed implementation of injunctive relief. While the Court finds that plaintiff is entitled to pre- and post-judgment interest as well as an enhancement of damages for that infringement which occurred post-judgment, it declines to award multiple damages or attorney's fees.

### Multiple Damages

35 U.S.C. § 284 provides that "the court may increase the damages up to three times the amount found or assessed." The jury's finding of willfulness permits this Court to award multiple damages in its discretion, but does not require such an award. *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1581 (Fed.Cir.1992).

> In exercising its discretion the trial court may consider the weight of the evidence of willfulness. The court thus considers the culpability of the infringer with due attention to any circumstances and mitigation, the closeness of the question, and any other factors pertinent to the award, in that case, of exemplary damages.

*Id.* Among the other factors which may be considered are whether the infringer deliberately copied, whether the infringer had formed a good faith belief that the patent was invalid or not infringed, and the infringer's behavior as a party to the litigation. *Bott v. Four Star Corp.,* 807 F.2d 1567, 1572 (Fed.Cir.1986).

Although the defendants in this case willfully used the plaintiff's patented process without acquiring a license, the Court finds that multiple damages are inappropriate based upon the strength of the defendants' invalidity defense. Defendants' challenge to the plaintiff's patent on the basis of obviousness was sufficiently strong that enhancement of damages would be inappropriate. Defendants' vigorous pursuit of this defense, both here and in the Patent Trademark Office evidences a good faith belief in the invalidity defense.

Neither does the Court find that the defendants' behavior during the prosecution of this case warrants enhanced damages. While defendants pursued several arguments and defenses available to them, the Court rejects plaintiff's characterization of defendants' tactics as the "shotgun approach." The Court does not find that the defendants proceeded with the purpose of causing increased delay and expense to the plaintiff, but was pursuing legitimate defenses to the allegations of patent infringement.

Given the public interest in legitimate challenges to the validity of a patent monopoly, the Court finds that it would be inappropriate to enhance damages under these circumstances.

### Attorney's Fees

35 U.S.C. § 285 permits the Court to award attorney's fees to the plaintiff "in exceptional cases." As with enhanced damages a finding of willfulness is a sufficient basis to award attorney's fees, but does not mandate such an award. *Brooktree,* 977 F.2d at 1582. In general, a case is exceptional when the defendant's conduct causes an unnecessary and outcome certain lawsuit or where the defendant displays bad faith in the pre-trial and trial stages of the suit. *Kloster Speedsteel AB v. Crucible, Inc.,* 793 F.2d 1565, 1580 (Fed.Cir.1986). The Court has already indicated that it does not believe this case was outcome certain when filed, nor does it find the defendants' behavior during the prosecution of this case to have been in bad faith. Accordingly, the Court finds that this is not an exceptional case justifying the

award of attorney's fees on the same basis that it declines to award multiple damages.

*Judgment Interest*

■ Section 284 provides that upon finding for the claimant the Court shall award the claimant damages "together with interest and costs as fixed by the Court." The effect of this language is that pre-judgment interest should ordinarily be awarded in order to fully compensate a plaintiff for the infringement. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). Although such interest may be denied under special circumstances such as where the plaintiff needlessly delays in commencing the lawsuit, there are no special circumstances in this case which would warrant the denial of pre-judgment interest. To the contrary, this is a typical set of circumstances where pre-judgment interest is necessary to afford plaintiff complete relief for the infringement.

The Court has examined the calculation of pre-judgment interest offered by plaintiff's expert Dr. Stewart using interest rates suggested by the defendants and finds it to be appropriate. Furthermore, defendants raise no objection to Dr. Stewart's calculations. Accordingly, judgment will be amended to award pre-judgment interest in the amount of $544,425. Post-judgment interest is also awarded pursuant to 28 U.S.C. § 1961.

*Post–Judgment Infringing Sales*

■ The parties are in agreement that plaintiff is entitled to certain additional damages as a result of subsequent sales of defendants' products. The parties differ as to the appropriate method of calculating such damages and the appropriate date from which to begin the calculation. The Court concludes that such damages shall be awarded on the basis of product sales which occurred after the entry of judgment at the rate of 4.558 percent of post-judgment sales revenue based upon extrapolation from the jury's verdict.

The Court finds no justification for awarding additional damages for that period of time prior to trial for which plaintiff offered no evidence of lost profits. Plaintiff was entitled to establish damages for the entire period or to urge the jury to accept a projection from past sales, but chose not to present such evidence. The Court finds no stipulation by defendants, implicit or explicit, which would permit the award of damages for that period of time which the jury could properly have considered. Indeed, it is not clear whether the jury awarded damages for the period of time up to and including the date of trial. Under the circumstances, awarding additional amounts for damages incurred before trial would be an improper invasion of the jury's province to determine actual damages and an inappropriate use of 35 U.S.C. § 284 to enhance inadequate compensatory damages. *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1579 (Fed.Cir.1991); *Dimick v. Scheidt*, 293 U.S. 474, 486–87, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1953).

As it concerns the method of calculating damages, it is most appropriate to base the calculation on lost sales rather than pounds of product and to approximate that award based upon the ratio of damages to sales determined from the jury's verdict. Most of the jury's award was attributable to lost profits, a calculation inherently based upon sales rather than volume of product. Accordingly, the Court orders an accounting of defendants' post-judgment sales and an award of additional damages consistent with that accounting and the rulings contained in this memorandum.

## ORDER

IT IS ORDERED that defendants' motions for entry of judgment pursuant to Rule 58, for entry of judgment as a matter of law pursuant to Rule 50, and for a new trial pursuant to Rule 59 are DENIED.

IT IS FURTHER ORDERED that plaintiff's motions for multiple damages and attorney's fees are DENIED.

IT IS FURTHER ORDERED that post-judgment interest is awarded pursuant to 28 U.S.C. § 1961, that defendants shall provide an accounting of their post-judgment sales and that plaintiff shall recover additional damages based upon that accounting and the methodology set forth in this memorandum.

IT IS FURTHER ORDERED that judgment be amended to include pre-judgment interest in the amount of $544,425.